**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE UNIVERSITY OF CHICAGO MEDICAL CENTER,<br>5841 South Maryland Avenue<br>Chicago, IL 60637-1470,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT F. KENNEDY, JR., Secretary,<br>U.S. Department of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, DC 20201,<br><br>Defendant. | Civil Action No. ___________ |

## COMPLAINT

Plaintiff, The University of Chicago Medical Center ("the Hospital"), by and through its undersigned attorneys, brings this action against defendant Robert F. Kennedy Jr., in his official capacity as Secretary ("the Secretary") of the United States Department of Health and Human Services ("HHS"), and states as follows:

### Preliminary Statement

1. This action arises under Title XVIII of the Social Security Act, 42 U.S.C. §§1395 *et seq*. ("the Medicare Act"), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§551 *et seq*. The Hospital brings this action to assure that it receives complete and proper Medicare payment for the capital-related costs relating to the services that the Hospital provided to Medicare beneficiaries during its fiscal years that ended on June 30, 2018 ("FY 2018"), June 30, 2019 ("FY 2019"), and June 30, 2020 ("FY 2020") (together "FYs 2018–2020"). This action is necessary because the Secretary improperly applied to the Hospital in FYs 2018–2020 a

regulation that this Court set aside as unlawful in *Toledo Hosp. v. Becerra*, 621 F. Supp. 3d 13 (D.D.C. 2021), which caused the Hospital's Medicare payment for capital-related costs for FYs 2018–2020 to be understated.

2. In order for Medicare-participating hospitals, such as the Hospital, to be properly compensated for the services provided to Medicare beneficiaries, the Medicare program must pay its share of the hospitals' operating and capital costs. At all times relevant to this action, the Medicare Act requires the Secretary to make payments for both operating costs and capital costs using a "prospective" payment methodology. Under the prospective payment methodology, Medicare payments are not based directly on the costs actually incurred by the hospital. Rather, hospitals are paid predetermined, nationally applicable rates based on the diagnoses of the patient at discharge categorized within one or more Medicare severity diagnosis-related groups ("MS-DRGs"), subject to certain payment adjustments. 42 U.S.C. §1395ww(d)(1)-(5); 42 C.F.R. Part 412. The rates that the Secretary uses to make Medicare payments under the prospective payment methodology for discharges in a Federal Fiscal Year ("FFY") are established before the start of that FFY.

3. In 1983, the Secretary implemented the Medicare prospective payment methodology for operating costs. Although operating costs are not at issue in this action, it is important to note that one of the adjustments to the Medicare prospective payment methodology for operating costs is the frequently-litigated Medicare "disproportionate share hospital" or "DSH" adjustment, which is available to hospitals that treat a disproportionately large share of low-income patients. *See* 42 U.S.C. §1395ww(d)(5)(F). Congress enacted the DSH adjustment in recognition of the relatively higher costs associated with providing services to low-income patients, which have been found to result from their generally poorer health. The DSH

adjustment provides additional Medicare reimbursement to qualifying hospitals for the increased cost of providing services to their low-income patients and a hospital that qualifies for a DSH payment is known as a "DSH hospital."

4. In 1991, the Secretary implemented the Medicare prospective payment methodology for capital-related costs, which are at issue in this action. *See* Prospective Payment System for Inpatient Hospital Capital-Related Costs, 56 Fed. Reg. 43,358 (Aug. 30, 1991). By statute, in addition to a per discharge capital cost payment, the Secretary may provide for adjustments "to take into account variations in the relative costs of capital and construction for the different types of facilities or areas in which they are located." *See* 42 U.S.C. §1395ww(g)(1)(B)(ii). Under this statute, the Secretary conducted an extensive cost data analysis to determine what kinds of payment adjustments should be made to the capital cost MS-DRG inpatient discharge payment. *See* 56 Fed. Reg. 43,358, 43,369 (Aug. 30, 1991)).

5. The cost analysis indicated that capital-related costs were correlated *inter alia* with a hospital's (a) large urban status, (b) status as a DSH hospital, and (c) teaching hospital status. *Id.* at 43,370. Based on these findings, the Secretary decided to make an adjustment to the prospective payment methodology for capital-related costs based on a hospital's DSH status because the cost analysis indicated that a hospital's disproportionate share percentage of low-income patients affects capital costs for urban hospitals with at least 100 beds. 56 Fed. Reg. at 43,377. Thus, the Secretary created a "capital DSH adjustment" for these hospitals. *See* 42 C.F.R. §412.320. But the Secretary did not find the same effect on costs for rural hospitals or urban hospitals with fewer than 100 beds. 56 Fed. Reg. at 43,377. As a result, those hospitals are not eligible for a capital DSH adjustment. 42 C.F.R. §412.320(a)(1). At all times relevant to

this action, the Hospital was a DSH hospital with more than 100 beds located in a large urban area (Chicago).

6. Since the inception of the prospective payment methodology for capital-related costs in 1991, the Secretary has always based capital cost prospective payment system methodology changes on data regarding actual hospital capital costs, with one exception. That exception occurred in a final rule issued in 2006, where the Secretary adopted a regulation, codified at 42 C.F.R. §412.320(a)(1)(iii), that denied a capital DSH adjustment to urban hospitals with at least 100 beds that had elected to acquire "rural" status for purposes of the prospective payment methodology for operating costs. The Secretary's adoption of the 2006 version of 42 C.F.R. §412.320(a)(1)(iii) was unlawful because (a) there is no statutory authority that allows the Secretary to use a hospital's election of rural status under the operating prospective payment system to eliminate the hospital's capital DSH adjustment, and (b) the Secretary did not, and did not even seek to, justify the elimination of the capital DSH adjustment for otherwise qualifying DSH hospitals on the grounds that acquiring "rural" status for operating cost purposes reduced their capital costs.

7. The 2006 version of 42 C.F.R. §412.320(a)(1)(iii) was challenged in this Court in *Toledo*, *supra,* where this Court found the Secretary "did not take costs into account at all" when adopting the 2006 changes to 42 C.F.R. §412.320(a)(1)(iii). 621 F. Supp. 3d at 17. This Court thus overturned the application of that regulation to eliminate the capital DSH adjustment for the plaintiff in *Toledo* and remanded the matter back to the Secretary "for a redetermination as to Toledo Hospital's eligibility for the capital DSH adjustment" without applying the 2006 changes to 42 C.F.R. §412.320(a)(1)(iii). *Id.*

8. On remand, the Secretary acquiesced in this Court's decision and revised 42 C.F.R. §412.320(a)(1)(iii) to abandon the elimination of the capital DSH adjustment to otherwise qualifying DSH hospitals that had elected to acquire "rural" status for their operating costs, but made the change effective only with respect to discharges on or after October 1, 2023. 88 Fed. Reg. 58,640, 59,117 (Aug. 28, 2023). Thus, for discharges occurring between October 1, 2006 and September 30, 2023, for urban hospitals that had reclassified as rural for operating costs payment purposes under 42 C.F.R. §412.103, including the Hospital for FYs 2018-2020, the Secretary's position is that these hospitals are still deemed rural for the purposes of the capital cost prospective payment methodology and, therefore, do not qualify for capital DSH adjustments during this period. *See* 42 C.F.R. §412.320(a)(1)(iii).

9. This action arises because the Secretary, acting through the Secretary's Medicare Administrative Contractor, refused to issue capital DSH adjustments to the Hospital for FYs 2018–2020 based on applying the 2006 version of 42 C.F.R. §412.320(a)(1)(iii) solely because the Hospital had acquired rural status in FYs 2018–2020 for Medicare operating cost reimbursement purposes, even though it is undisputed that the Hospital otherwise qualified for a capital DSH adjustment for FYs 2018–2020. The Secretary's refusal to issue capital DSH adjustments to the Hospital for FYs 2018–2020 based on applying the 2006 version of 42 C.F.R. §412.320(a)(1)(iii) is arbitrary, capricious, and otherwise contrary to law, in violation of the APA, and other authorities and, thus, must be reversed.

10. Because the Secretary has refused to apply the abandonment of the 2006 version of 42 C.F.R. §412.320(a)(1)(iii) to the Hospital's FYs 2018–2020, the relief available to the Hospital as of October 1, 2023, is not available before that date. The Secretary's refusal to apply the abandonment of the 2006 version of 42 C.F.R. §412.320(a)(1)(iii) to the Hospital for periods

before October 1, 2023, is unlawful because *inter alia* (a) there is no statutory authority that allows the Secretary to use a hospital's election of rural status under the operating prospective payment system to eliminate the hospital's capital DSH adjustment, and (b) doing so is arbitrary, capricious, and otherwise unlawful under the APA. Thus, (a) the 2006 version of 42 C.F.R. §412.320(a)(1)(iii) is void *ab initio* and cannot be applied to the Hospital even for periods before October 1, 2023, and (b) the Secretary's 2023 abandonment of the 2006 version of 42 C.F.R. §412.320(a)(1)(iii) should have retroactive effect back to October 1, 2006.

11. The Hospital timely appealed the contractor's refusal to issue capital DSH adjustments to the Hospital for FYs 2018–2020 to the Provider Reimbursement Review Board ("PRRB" or "Board"), the administrative tribunal within HHS that hears Medicare payment appeals. Because the PRRB lacks the authority to adjudicate the validity of the Medicare statute, or regulations adopted under it, where a hospital is entitled to a PRRB hearing, the hospital may request that the PRRB determine that it lacks authority to decide a question of law or regulations relevant to the appeal. If the PRRB makes this determination, it must certify the case for expedited judicial review and the hospital may proceed immediately to court to obtain judicial review.

12. In decisions dated August 3, 2026 (for FY 2020) and August 25, 2026 (for FYs 2018 and 2019), the PRRB granted the Hospital's requests for expedited judicial review on the Secretary's refusal to issue capital DSH adjustments to the Hospital for FYs 2018–2020. In addition, the PRRB's August 25, 2026 decision (a) found that the Hospital had "failed to make an appropriate claim for the Capital DSH issue on its cost reports [for FYs 2018 and 2019] as required by 42 C.F.R. §413.24(j)," and thus was barred from receiving capital DSH adjustments for FYs 2018 and 2019, and (b) granted expedited judicial review on the Hospital's challenge to the

validity of 42 C.F.R. §413.24(j). By timely filing this Complaint, the Hospital has properly commenced this action for judicial review under 42 U.S.C. §1395oo(f)(1).

13. Among other relief, the Hospital seeks an order from this Court (a) declaring that the 2006 version of 42 C.F.R. §412.320(a)(1)(iii) is unlawful generally, and specifically as to discharges occurring the Hospital's during FYs 2018–2020, and must be vacated or, in the alternative, set aside as it relates to the Hospital, (b) declaring that 42 C.F.R. §413.24(j) is unlawful generally, and specifically as to the Hospital's claims for capital DSH adjustments for FYs 2018 and 2019, and both the regulation and the PRRB's decisions based thereon must be vacated or, in the alternative, set aside as they relate to the Hospital, (c) declaring that the Hospital has more than 100 beds and is physically located in an urban area and, thus, qualifies for a capital DSH adjustment for FYs 2018–2020, notwithstanding that the Hospital acquired rural status for operating costs payment purposes for these FYs, (d) requiring the Secretary to pay to Hospital, with interest, all sums associated with the capital DSH adjustments that have been wrongfully withheld, and (e) remanding this matter to the Secretary with instructions to calculate the capital DSH adjustment payments due to the Hospital for FYs 2018-2020, and pay them to the Hospital with interest calculated in accordance with 42 U.S.C. §1395oo(f)(2).

## **Jurisdiction and Venue**

14. This Court has jurisdiction under 42 U.S.C. §1395oo(f) (appeal of final Medicare program agency decision) and 28 U.S.C. §1361 (mandamus). Venue lies in this judicial district under 42 U.S.C. §1395oo(f) and 28 U.S.C. §1391.

## **Parties**

15. Plaintiff University of Chicago Medical Center (Medicare Provider No. 14-0088) is a not-for-profit, acute-care teaching hospital located in Chicago, Illinois. The Hospital

furnishes inpatient and outpatient hospital services, including to patients entitled to benefits under the Medicare program.

16. Defendant Robert F. Kennedy, Jr., is the Secretary of the Department of Health and Human Services, the federal department which contains the Centers for Medicare & Medicaid Services ("CMS"). The Secretary, the federal official responsible for administration of the Medicare Program, has delegated the responsibility to administer that program to CMS. Before June 14, 2001, CMS was known as the Health Care Financing Administration ("HCFA"). In this Complaint, the Hospital generally refers to the agency as CMS.

## Legal and Regulatory Background

### A. General Background of the Medicare Program

17. The Medicare Act establishes a system of health insurance for the aged, disabled, and individuals with end-stage renal disease. Pursuant to 42 U.S.C. §1395cc, the Hospital entered into a written agreement with the Secretary to be paid for providing hospital and other services to Medicare-eligible individuals.

18. Hospitals are entitled to payment from Medicare for their "reasonable costs" incurred in providing services to Medicare beneficiaries, in accordance with regulations adopted by the Secretary. "Reasonable cost" is defined in the statute as the:

> cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services.

42 U.S.C. §1395x(v)(1)(A).

19. In adopting reasonable cost regulations, the statute requires the Secretary to "take into account both direct and indirect costs of providers of services . . . in order that, under the

methods of determining costs, *the necessary costs of efficiently delivering covered services to individuals covered by [Medicare] will not be borne by individuals not so covered*." *Id*. (emphasis added). The Medicare Act further requires that "[n]o rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits [or] the payment for services . . . [under Medicare] shall take effect unless it is promulgated by the Secretary by regulation . . . ." 42 U.S.C. §1395hh(a)(2).

20. Based on delegated authority from the Secretary, CMS implements the Medicare program, in part, through the issuance of official Rulings. *See* 42 C.F.R. §401.108. In addition to the substantive rules published in the Code of Federal Regulations and the Rulings, CMS publishes numerous other interpretative rules implementing the Medicare program, which are compiled in one or more of the CMS Manuals.

21. Medicare payment to providers of services is commonly carried out by contractors acting as agents of the Secretary pursuant to contracts with him, known as "Medicare Administrative Contractors." Each Medicare-participating hospital is assigned to a Medicare Administrative Contractor. At all times relevant to this action, the Hospital's Medicare Administrative Contractor has been National Government Services, Inc.

## B. Medicare Hospital Operating and Capital Prospective Payment Methodologies Includes a Wage Index Adjustment

22. The Medicare Act requires the Secretary to make payments to the Hospital for services provided to Medicare beneficiaries for both operating costs and capital costs using a prospective payment methodology subject to certain payment adjustments. 42 U.S.C. §1395ww(d)(1)-(5); 42 C.F.R. Part 412. One of these adjustments is the DSH adjustment discussed above. Another is the wage index adjustment, which accounts for the variation in labor-related costs across the country. 42 U.S.C. §1395ww(d)(3)(E).

23. Each MS-DRG is assigned a specific weighting fraction (42 U.S.C. §1395ww(d)(4)), which is multiplied by a "standardized amount" to yield the Medicare payment due for that particular admission based on the diagnosis at discharge. 42 U.S.C. §1395ww(d)(3)(A). The standardized amount is comprised of a labor-related portion and a non-labor-related portion. 42 U.S.C. §1395ww(d)(3)(E). The labor-related portion is multiplied by a labor factor, called the "wage index," which varies based on the geographic area where the hospital is located. *Id*.

24. To accomplish the relative wage-level adjustment, the Secretary calculates and assigns a wage index value to each geographic wage area that reflects the relative hospital wage levels of that area to the hospital wage levels of all geographic areas taken together. 42 C.F.R. §412.64(h). A higher wage index corresponds with higher labor costs, and consequently, yields a higher reimbursement rate for the hospital under the prospective payment methodologies.

## C. <u>Geographic Reclassification</u>

25. A hospital's geographic location plays a key role in determining its prospective payment rate. For example, a hospital's location—urban or rural—will affect the hospital's wage index. *See* 42 U.S.C. §1395ww(d)(3)(E)(i). The Secretary has defined an "urban area" by adopting the definition of "metropolitan statistical area" promulgated by the Office of Management and Budget. *See* 42 C.F.R. §412.64(b)(1)(ii)(A). A "rural area" is "any area outside an urban area." 42 C.F.R. §412.64(b)(1)(ii)(C).

26. Historically, this system yielded inequitable results for some hospitals. For example, a hospital on the edge of a wage area with a low wage index that abuts a wage area with a higher wage index might compete for the same labor pool with the hospitals in the nearby higher wage index area. Even though its labor costs might be as high as the hospitals in the

nearby wage area with a higher wage index, the hospital on the edge of a low wage index area would receive a lower reimbursement based on its geographical wage area's lower wage index.

27. To solve this problem, in 1989, Congress enacted a statute providing for a geographic reclassification system. 42 U.S.C. §1395ww(d)(10). Under this system, the newly-created Medicare Geographic Classification Review Board ("MGCRB") can redesignate hospitals to a different wage area from that to which they have been otherwise designated in order to receive a different wage index, if they meet certain criteria. Thus, a hospital (either rural or urban) within a lower wage index area can reclassify to a higher wage index area (often a nearby urban area) to more accurately reflect its labor costs.

28. When a rural hospital redesignates to an urban area for a different wage index, it otherwise retains its rural status for other Medicare payment purposes. *See* Geographical Classification Review Board; Procedures and Criteria, 55 Fed. Reg. 36,754, 36,760 (Sept. 6, 1990) ("A hospital that is reclassified from a rural or other urban area only for purposes of the wage index is not considered urban for any other purpose than its labor market area designation."). As a result, a hospital can helpfully be considered "rural" in some respects (*e.g.*, it is situated in a rural area and attends to the needs of a rural population) and "urban" in other respects (*e.g.*, it needs to attract trained staff from nearby urban areas and to do so must pay urban wage rates).

29. As specifically relevant here, in 1999, Congress enacted a new geographic reclassification scheme. Section 401 of the Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act of 1999, Pub. L. No. 106-113, 113 Stat. 1501 (Nov. 29, 1999), permits certain hospitals located in an urban area to be reclassified as rural. *See* 42 U.S.C. §1395ww(d)(8)(E). To reclassify from urban to rural, a hospital can, for instance, show that it would qualify as a

"rural referral center" or a "sole community hospital" but for its urban status. 42 U.S.C. §1395ww(d)(8)(E)(ii)(III). Unlike the wage index reclassification, a Section 401 reclassification is not based on the hospital's costs. *See id.*

30. Accordingly, under the current reclassification mechanisms, a geographically urban hospital may be classified as "rural" for certain purposes and, at the same time, the hospital may apply to the MGCRB to be designated to a higher wage-index urban area (including a different urban area than the one in which the hospital is geographically located) in order to obtain higher wage reimbursements.

**D. <u>The Effect of Section 401 Reclassification on the Capital DSH Adjustment</u>**

31. This action concerns how the Section 401 reclassification process affects the ability of a hospital to obtain for a capital DSH adjustment under the capital cost prospective payment system. In 2006, the Secretary, using notice-and-comment rulemaking, proposed changes to the regulations that govern capital DSH adjustments. *See* Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2007 Rates, 71 Fed. Reg. 47,870, 48,104 (Aug. 18, 2006). Under the 2006 rule, geographically urban hospitals that reclassify as rural under Section 401 are ineligible for a capital DSH adjustment because the Secretary treats them as rural for purposes of determining capital DSH eligibility. This means that such a hospital would not get a capital DSH adjustment because only urban hospitals with more than 100 beds are eligible for a capital DSH adjustment. *See* 42 C.F.R. §412.320(a)(1)(iii).

32. The 2006 codified regulation states, in relevant part:

> (a) Criteria for classification. A hospital is classified as a "disproportionate share hospital" for the purposes of capital prospective payments if either of the following conditions is met:
>
> (1) The hospital is located in an urban area, has 100 or more beds as determined in accordance with § 412.105(b), and serves low-income patients as determined

> under § 412.106(b).
>
> . . .
>
> (iii) For purposes of this section, the geographic classifications specified under § 412.64 apply, except that, effective for discharges occurring on or after October 1, 2006, for an urban hospital that is reclassified as rural as set forth in § 412.103, the geographic classification is rural.

*See* 42 C.F.R. §412.320(a)(1)(iii). When promulgating the 2006 changes to 42 C.F.R. §412.320(a)(1)(iii), the Secretary stated that the changes were necessary for two reasons: first, in order to "reflect [the agency's] historic policy that hospitals reclassified as rural under [Section 401] are considered rural under the capital PPS," and second, to further the Secretary's historic practice of pursuing consistency in the geographic classifications used for both operating and capital PPS calculations. *See* 71 Fed. Reg. at 48,104. Thus, based on the 2006 changes to 42 C.F.R. §412.320(a)(1)(iii), a geographically urban DSH hospital with at least 100 beds that reclassifies as rural under Section 401 for operating prospective payment methodology purposes loses its eligibility for the capital DSH adjustment under 42 C.F.R. §412.320(a)(1)(iii).

### E. <u>The *Toledo* Decision</u>

33. The 2006 changes to 42 C.F.R. §412.320(a)(1)(iii) were challenged in this Court in *Toledo*, *supra*, which found the Secretary "did not take costs into account at all" when adopting those changes. 621 F. Supp. 3d at 17. This Court set aside the application of the 2006 changes to 42 C.F.R. §412.320(a)(1)(iii) to eliminate the capital DSH adjustment for the plaintiff and remanded the matter back to the Secretary "for a redetermination as to Toledo Hospital's eligibility for the capital DSH adjustment." *Id.*

34. On remand, the Secretary revised 42 C.F.R. §412.320(a)(1)(iii) to abandon the elimination of the capital DSH adjustment to otherwise qualifying DSH hospitals, but made the change effective only with respect to discharges on or after October 1, 2023. 88 Fed. Reg.

58,640, 59,117 (Aug. 28, 2023). This action arises because the Secretary, acting through his Medicare Administrative Contractor, refused to issue a capital DSH adjustment to the Hospital for FYs 2018–2020 based solely on the 2006 changes to 42 C.F.R. §412.320(a)(1)(iii) because the Hospital had "acquired" rural status for operating cost reimbursement purposes for FYs 2018–2020, even though it is undisputed that the Hospital otherwise qualified for capital DSH adjustments for FYs 2018–2020.

## E. The Secretary's "Substantive Claim" Requirement

35. Congress established by statute that a provider is entitled to appeal a Medicare payment determination if the provider is "dissatisfied with the final determination of the [provider's Medicare Administrative Contractor] as to the amount of total program reimbursement," the amount in controversy is met (either $10,000 for an individual appeal or $50,000 for a group appeal), and the "provider files a hearing request within 180 days after notice of the [contractor's] final determination." 42 U.S.C. §1395oo(a).

36. Once a jurisdictionally proper appeal is before the PRRB under 42 U.S.C. §1395oo(a), that statute further directs that "[t]he Board shall have the power to affirm, modify, or reverse a final determination of the [contractor] with respect to a cost report and to make any other revisions on matters covered by such cost report (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination." 42 U.S.C. §1395oo(d)

37. In 1988, the Supreme Court held that "[t]his language allows the Board, once it obtains jurisdiction pursuant to subsection (a), to review and revise a cost report with respect to matters not contested before the fiscal intermediary. The only limitation prescribed by Congress is that the matter must have been 'covered by such cost report.'" *Bethesda Hospital Ass'n. v.*

*Bowen*, 485 U.S. 399, 406 (1988). "'[O]nce Board jurisdiction pursuant to subsection (a) obtains, anything in the original cost report is fair game for a challenge by virtue of subsection (d).'" *Banner Heart Hospital v. Burwell*, 201 F. Supp. 3d 131, 135 (D.D.C. 2016) (quoting *HCA Health Servs. of Oklahoma*, Inc. v. Shalala, 27 F.3d 614, 617 (D.C. Cir. 1994)).

38. In *Bethesda*, the Supreme Court rejected the Secretary's attempt to require providers to protest regulatory challenges on their cost reports in order to establish that they were "dissatisfied with a final determination" of the Medicare Administrative Contractor. *See Bethesda*, 485 U.S. at 401–402. The Secretary contended that, although there was no express regulation so requiring, the statutory requirement that a provider be "dissatisfied" "necessarily incorporate[d] an exhaustion requirement." *Id.* at 404. The provider could not be "dissatisfied," the Secretary argued, if the contractor awarded the sums actually requested in the cost report. *Id.* The Supreme Court disagreed:

> Providers know that, under the statutory scheme, the [contractor] is confined to the mere application of the Secretary's regulations, that the [contractor] is without power to award reimbursement except as the regulations provide, and that any attempt to persuade the [contractor] to do otherwise would be futile. Thus, petitioners stand on different ground than do providers who bypass a clearly prescribed exhaustion requirement or who fail to request from the [contractor] reimbursement for all costs to which they are entitled under applicable rules

*Id.* at 404–05.

39. Furthermore, the Supreme Court found: "Under this statutory scheme, requiring submission of the regulatory challenge to the [contractor] is quite unnecessary. The Board has a role in shaping the controversy that is subject to judicial review; the [contractor] does not." *Id.* at 407.

40. In 2008, the Secretary adopted a regulation that required hospitals to "self-disallow" regulatory challenges in their cost reports or they would forfeit their right to administrative and judicial review under 42 U.S.C. §1395oo. *See* 42 C.F.R. §405.1835 (2008).

However, the 2008 regulatory self-disallowance requirement fared no better than the interpretation the Secretary had previously advanced in *Bethesda*. Applying *Bethesda*, this Court held that the 2008 self-disallowance requirement "conflict[ed] with the plain text of section 1395oo." *Banner Heart* at 142. "Defendant here has done precisely what the [*Bethesda*] Court determined was 'quite unnecessary'—it has required submission of a regulatory challenge to the [contractor] as a precondition of the Board's jurisdiction." *Id.*

41. Thereafter, in CMS Ruling No. 1727-R (April 23, 2018), CMS properly acquiesced to the *Banner Heart* decision stating, "the *Banner* court concluded that, given the Supreme Court's interpretation of section 1878(a)(1)(A) of the Act (42 U.S.C. 1395oo(a)(1)(A)) in *Bethesda* [], the 2008 self-disallowance regulation may not be applied to appeals raising a legal challenge to a payment regulation or other policy that the Medicare contractor cannot address." Accordingly, CMS Ruling 1727-R prohibited applying the 2008 self-disallowance requirement to deny jurisdiction over appeal items that were "non-allowable because . . . of a regulation or other payment policy that bound the Medicare contractor and left it with no authority or discretion to make payment" in the manner sought in the Board appeal.

42. In 2016, the Secretary shifted the "protest" or "self-disallowance" requirement to the cost reporting regulation (42 C.F.R. §413.24(j)) and converted the "front-end" jurisdictional prohibition into a "back-end" payment prohibition, through a regulation that denies any recovery of payment items that are found not to have been properly self-disallowed (42 C.F.R. §405.1873). This is commonly known as the "substantive claim requirement."

43. The process may be somewhat less direct, but the outcome is the same because, based on the application of 42 C.F.R. §405.1873, a provider that is found not to have followed the substantive claim requirement in 42 C.F.R. §413.24(j) with respect a payment item is

precluded from receiving any reimbursement for the payment item as part of an appeal to the PRRB.

44. Thus, the substantive claim requirement in 42 C.F.R. §413.24(j) and 42 C.F.R. §405.1873 operate as a *de facto* jurisdictional bar under certain circumstances to all regulatory challenges that have not been self-disallowed. Specifically, under 42 C.F.R. § 413.24(j) and 42 C.F.R. §405.1873, as a condition to being entitled to receive payment for a Medicare payment item, a hospital must either: (a) claim a particular item on its Medicare cost report (where Medicare policies allow the payment as claimed), or (b) if the hospital believes that Medicare policies do not currently allow payment for the item, protest that policy by "self-disallowing" the item by (i) including "an estimated reimbursement amount for each specific self-disallowed item in the protested amount line (or lines) of the provider's cost report" and (ii) attaching "a separate work sheet to the provider's cost report for each specific self-disallowed item, explaining why the provider self-disallowed each specific item (instead of claiming full reimbursement in its cost report for the specific item) and describing how the provider calculated the estimated reimbursement amount for each specific self-disallowed item." 42 C.F.R. § 413.24(j)(2); *see also* 42 C.F.R. §405.1873 (requiring the PRRB to determine whether the requirements of 42 C.F.R. §413.24(j) have been met before granting any relief to a hospital appealing a particular item to the Board).

**F.** **<u>The Administrative Procedure Act</u>**

45. Under the APA, a "reviewing court shall… hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). Furthermore, a "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be…in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §706(2)(C).

46. Additionally, a "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be…without observance of procedure required by law." 5 U.S.C. §706(2)(D). The APA dictates rulemaking procedural requirements, specifically the requirement that the agency provides notice of proposed rulemaking, that the agency affords interested parties an opportunity to comment on the proposed rulemaking, and that the agency considers the relevant matters presented. 5 U.S.C. §553.

## **Medicare Appeals Process**

### **A. The Cost Report Submission and Appeals Process**

47. At the close of its FY, a hospital must submit a Medicare "cost report" showing the costs incurred during the FY and other data used to determine the Medicare reimbursement due to the hospital for the FY. The hospital's Medicare Administrative Contractor is required to analyze and audit the cost report and issue a Medicare Notice of Amount of Program Reimbursement ("NPR"), which informs the hospital of the final determination of its total Medicare reimbursement for the FY.

48. If a hospital is dissatisfied with its contractor's final determination of the hospital's total Medicare program reimbursement for a cost reporting period, as reflected in the NPR, it may seek to have the NPR corrected or altered in one of two ways:

a. The hospital has a right to obtain a hearing before the PRRB by filing an appeal with the PRRB within 180 days of receiving its NPR. 42 U.S.C. §1395oo.

b. The hospital may request reopening of a contractor's determination within three years of the date of notice to the hospital of the contractor's determination. 42 C.F.R. §405.1885.

If a hospital's reopening request is granted, and there is a change in the hospital's Medicare payment, the MAC's updated Medicare payment determination is set forth in a Revised NPR. 42 C.F.R. §405.1885(a). The hospital has a right to obtain a hearing before the PRRB if it is dissatisfied with the NPR or any Revised NPR by filing an appeal with the PRRB within 180 days of the hospital's receipt of its NPR or any Revised NPR. 42 U.S.C. §1395oo; 42 C.F.R. §405.1889.

## B. <u>PRRB Hearing Procedures and the Procedure for Administrative and Judicial Review of PRRB Decisions</u>

49. The Medicare statute specifies the following requirements for a PRRB appeal:

> Any provider of services which has filed a required cost report within the time specified in regulations may obtain a hearing with respect to such cost report by a Provider Reimbursement Review Board . . . if –
>
> > (1) such provider . . . is dissatisfied with a final determination of . . . its fiscal intermediary . . . as to the amount of total program reimbursement due the provider for the items and services furnished to individuals for which payment may be made under this subchapter for the period covered by such report . . .
> >
> > (2) the amount in controversy is $10,000 or more, and
> >
> > (3) such provider files a request for a hearing within 180 days after notice of the intermediary's final determination . . . .

42 U.S.C. §1395oo(a).

50. Once jurisdiction for an appeal is established under 42 U.S.C. §1395oo(a), 42 U.S.C. §1395oo(d) grants the PRRB broad authority to decide all matters related to the provider's cost report:

> The Board shall have the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination.

42 U.S.C. §1395oo(d). In addition to having the authority to make substantive decisions concerning Medicare reimbursement appeals, the PRRB is authorized to decide questions relating to its jurisdiction.

51. The decision of the PRRB on substantive or jurisdictional matters constitutes final administrative action unless the Secretary reverses, affirms, or modifies the decision within 60 days of the hospital's notification of the PRRB's decision. 42 U.S.C. §1395oo(f)(1); 42 C.F.R. §§405.1875 and 405.1877. The Secretary has delegated authority under the statute to review PRRB decisions to the CMS Administrator.

52. A hospital may obtain judicial review of a final administrative decision, whether substantive or jurisdictional, by filing suit within 60 days of receipt of the final action on the administrative appeal in the United States District Court for the judicial district in which the hospital is located or in the United States District Court for the District of Columbia. 42 U.S.C. §1395oo(f). In any such action, the Secretary is the proper defendant because, under 42 C.F.R. §421.5(b), the Secretary, acting through CMS, "is the real party of interest in any litigation involving the administration of the [Medicare] program." Under 42 U.S.C. §1395oo(f)(2), interest is to be awarded in favor of a hospital that prevails in an action brought under 42 U.S.C. §1395oo(f).

53. The PRRB is bound by, and hence lacks the authority to adjudicate the validity of, the Medicare statute, regulations under the Medicare statute, and CMS Rulings issued under the authority of the CMS Administrator. The PRRB must also "afford great weight" to guidance documents issued by CMS. *See* 42 C.F.R. § 405.1867.

54. Because the PRRB lacks authority to adjudicate the validity of the Medicare statute, or regulations promulgated under it, where a hospital is entitled to a PRRB hearing, the

hospital may request that the PRRB determine that it lacks authority to decide a question of law or regulations relevant to the appeal. If the Board makes this determination, it must certify the case for expedited judicial review. 42 U.S.C. §1395oo(f)(l); 42 C.F.R. § 405.1842. If the PRRB grants expedited judicial review, the hospital has 60 days to file suit in federal district court seeking judicial review. *See* 42 U.S.C. §1395oo(f)(1); 42 C.F.R. §405.1842(g)(2).

55. Judicial relief is available under the equitable remedy of mandamus where a hospital has a clear right to the relief sought and the Secretary has a defined and non-discretionary duty to honor that right. *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807 (D.C. Cir. 2001).

## **Factual Background**

56. The Hospital is a DSH-qualifying safety net hospital physically located in Chicago, Illinois. Chicago is within an "urban area" for Medicare payment purposes. Thus, the Hospital is physically located in an urban area for Medicare payment purposes. The Hospital underwent rural reclassification by application to CMS. Therefore, for FYs 2018–2020, although the Hospital remained physically located in an urban area, it was considered to be in the rural area of Illinois for Medicare operational costs payment purposes.

57. For FYs 2018–2020, the Hospital did not receive a capital DSH adjustment based solely on the Secretary's applying the 2006 changes to 42 C.F.R. §412.320(a)(1)(iii). The Hospital is entitled to relief because the 2006 changes to 42 C.F.R. §412.320(a)(1)(iii) cannot be applied to deny the Hospital a capital DSH adjustment for FYs 2018–2020 (or otherwise).

## **Procedural Background**

58. The Hospital timely and properly appealed to the PRRB to challenge the Secretary's refusal to give the Hospital capital DSH adjustments for FYs 2018–2020.

59. The Hospital's Medicare Administrative Contractor raised substantive claim challenges to the capital DSH adjustment item in the Hospital's FYs 2018 and 2019 appeals, but not in the Hospital's FY 2020 appeal, asserting that the Hospital failed to include an appropriate claim for the capital DSH adjustment item in its appeals for FYs 2018 and 2019, as allegedly required under 42 C.F.R. §413.24(j)(1). The Hospital timely filed responses to the contractor's FYs 2018 and 2019 substantive claim challenges, which explained that the substantive claim challenges lack merit because *inter alia* the Hospital properly protested the capital DSH adjustment item in its FYs 2018 and 2019 as-filed Medicare cost reports and, thus, the substantive claim challenges should be denied by the PRRB.

60. On July 9, 2026, for FY 2020, and August 11, 2026, for FYs 2018 and 2019, the Hospital filed requests for expedited judicial review, which is available to the Hospital because it is challenging, as follows, the validity of the Secretary's regulations, which cannot be overturned by the PRRB: (a) for FYs 2018–2020, the Secretary's 2006 regulation, and (b) for FYs 2018–2019, the substantive claim regulations at 42 C.F.R. §413.24(j) and 42 C.F.R. §405.1873.

61. In letters dated August 3, 2026 (for FY 2020 (Exhibit A, hereto)), and August 25, 2026 (for FYs 2018 and 2019 (Exhibit B, hereto)), the PRRB granted the Hospital's requests for expedited judicial review on the legality of the 2006 changes to 42 C.F.R. §412.320(a)(1)(iii) finding that (a) it has jurisdiction over the Hospital's challenge to the Secretary's refusal to give the Hospital capital DSH adjustments for FYs 2018–2020, (b) "there are no findings of fact for resolution by the Board," (c) it "is bound by the applicable existing Medicare law and regulation," and (d) it "is without authority to decide the legal question[]" of whether "42 C.F.R. §412.320(a)(1)(iii), as promulgated in the FY 2007 IPPS Final Rule, is substantively or procedurally valid." *See* Exhibit A at 24 and Exhibit B at 27.

62. With regard to the contractor's substantive claim challenges to the capital DSH adjustment items in the Hospital's FYs 2018 and 2019 PRRB appeals (no such challenge was filed in the Hospital's FY 2020 PRRB appeal), the PRRB's August 25, 2026 letter stated that the PRRB found that the Hospital "failed to include 'an appropriate claim for the specific item' that is the subject of its two individual appeals, as required under 42 C.F.R. §413.24(j)(1)." Exhibit B at 27. The PRRB also stated that "the question of the validity of the substantive claim regulations at 42 C.F.R. §§ 413.24(j) and 405.1873 falls within the provisions of 42 U.S.C. § 1395oo(f)(1) and hereby grants the Provider's request for EJR [*i.e.*, expedited judicial review] for the issue and the subject years." *Id.*

63. Under 42 U.S.C. §1395oo(f)(l), all administrative remedies have been exhausted and this case is now ripe for judicial review. This Complaint is timely filed within 60 days of the Hospital's receipt of the PRRB's determination, as required by 42 U.S.C. §1395oo(f)(1).

**<u>The Denial of Capital DSH Adjustments to the Hospital for FYs 2018–2020 is Unlawful and Must Be Reversed</u>**

64. This Court must reverse the Secretary's refusal to issue capital DSH adjustments to the Hospital for FYs 2018–2020 because the refusal is unlawful substantively and procedurally under the APA and the Medicare Act and implementing regulations. The Hospital met all criteria to qualify for capital DSH adjustments for FYs 2018–2020. The only reason that the Secretary did not issue capital DSH adjustments to the Hospital for FYs 2018–2020 was because of the 2006 regulatory changes to 42 C.F.R. §412.320(a)(1)(iii), which this Court overturned with regard to the plaintiff in the *Toledo* case. Although the Secretary in 2023 abandoned the approach in the 2006 regulatory changes to 42 C.F.R. §412.320(a)(1)(iii), the Secretary is continuing to apply the 2006 regulatory changes to 42 C.F.R. §412.320(a)(1)(iii) to periods before October 1, 2023, which includes the Hospital's FYs 2018–2020.

65. The Hospital is entitled to relief (a) based on the analysis set forth in the *Toledo* decision, and (b) because the Secretary's refusal to issue capital DSH adjustments to the Hospital for FYs 2018–2020 based on applying the 2006 version of 42 C.F.R. §412.320(a)(1)(iii) is arbitrary, capricious, and otherwise contrary to law, in violation of the APA, and other authorities and, thus must be reversed. The Hospital is also entitled to relief in light of the Secretary's unlawful refusal to apply the abandonment of the 2006 version of 42 C.F.R. §412.320(a)(1)(iii) to the Hospital for periods before October 1, 2023 because *inter alia* (a) there is no statutory authority that allows the Secretary to use a hospital's election of rural status under the operating prospective payment system to eliminate the hospital's capital DSH adjustment, and (b) doing so is arbitrary, capricious, and otherwise unlawful under the APA. Thus, the 2006 version of 42 C.F.R. §412.320(a)(1)(iii) is void *ab initio* and cannot be applied to the Hospital even for periods before October 1, 2023. Based on the foregoing, the Hospital respectfully asks the Court to reverse the Secretary's refusal to issue capital DSH adjustments to the Hospital for FYs 2018–2020.

**The PRRB's Finding that the Hospital Failed to Include an Appropriate Claim on the Capital DSH Adjustment Items for FYs 2018–2019 is Unlawful and Must Be Reversed**

66. The PRRB's finding that the Hospital "failed to include 'an appropriate claim for the specific item' that is the subject of its two individual appeals, as required under 42 C.F.R. §413.24(j)(1)" is arbitrary, capricious, and otherwise unlawful under the Medicare Act and the APA. Exhibit B at 27.

67. In its as-filed Medicare cost reports for FYs 2018 and 2019, the Hospital expressly protested CMS's refusal to issue capital DSH adjustments to the Hospital for those FYs due solely to the fact that the Hospital had been approved for rural status for operating costs payment purposes for those FYs. As the Hospital explained in its timely filed responses to the

contractor's FYs 2018 and 2019 substantive claim challenges, the Hospital's protests, as 42 C.F.R. §413.24(j)(2) required, included (a) "an estimated reimbursement amount for [the capital DSH] … self-disallowed item in the protested amount line … of the [Hospital's] cost report, and (b) "a separate work sheet … explaining why the [Hospital] … self-disallowed [the capital DSH] …. item (instead of claiming full reimbursement in its cost report for the specific item) …."

68. The PRRB, nevertheless, found that the Hospital had not fully complied with 42 C.F.R. §413.24(j)(2) because the Hospital's protest narratives allegedly did not "specifically describe how the [protested] amount was calculated…" under 42 C.F.R. §413.24(j)(2)(ii). This finding, as applied to the Hospital's protest of the capital DSH adjustment payment item for FYs 2018 and 2019, is arbitrary and capricious because "how" the impact was calculated is determined based on a well-established formula set forth in the capital prospective payment regulations, which straight-forwardly apply a qualifying hospital's "Capital disproportionate share adjustment factor" to its capital MS-DRG payments. *See* 42 C.F.R. §412.312 ("The payment amount for each discharge based on the Federal rate determined under §412.308(c) is determined under the following formula: [Federal rate × DRG weight × Geographic adjustment factor × Large urban add-on × (1 + Capital disproportionate share adjustment factor + capital indirect medical education adjustment factor) × (for hospitals located in Alaska and Hawaii, a cost-of-living adjustment factor)] + (Any applicable outlier payment)."); *id.* §412.320(b)(1) ("[T]he disproportionate share payment adjustment factor equals [e raised to the power of (.2025 × the hospital's disproportionate patient percentage as determined under § 412.106(b)(5)), −1], where e is the natural antilog of 1.").

69. The MAC did not need any further information from the Hospital to determine how the Hospital had calculated the estimated impact of the protested capital DSH adjustment

payment items for FYs 2018 and 2019. This is because all variables and formulae underlying the estimated reimbursement impact for the capital DSH adjustment payment item in the Hospital's as-filed FYs 2018 and 2019 Medicare cost reports were facially apparent based on rote application of CMS's formula and required no further explanation. Therefore, the Hospital's protests in its FYs 2018 and 2019 cost reports of CMS's failure to provide capital DSH adjustments for those FYs fully satisfied the requirements and purposes of the Secretary's substantive claim requirement.

70. Moreover, the PRRB's decision irrationally disregarded that CMS stated that contractors would seek clarification if necessary about hospital protests of cost report items. *See* 80 Fed. Reg. at 70,557 (stating that one of the reasons for the protest requirement is so the MAC "has an opportunity to correct any misconceptions that the provider may have about the item . . .[, *e.g.*,] that the item in question is actually an allowable cost . . . .") Here, the contractor was silent and thus waived any objection as to the form of the Hospital's protests of the capital DSH adjustment payment item for FYs 2018 and 2019. Accordingly, the Hospital met all the requirements of the self-disallowance regulation and is entitled to receive capital DSH adjustments for FYs 2019 and 2020. Further, the Secretary's self-disallowance regulations, 42 C.F.R. §413.24(j)(2) and 42 C.F.R. §405.1873, are arbitrary, capricious, and otherwise contrary to the Medicare Act and other authorities.

## COUNT I
## Judicial Review Under the APA and the Medicare Act
## (Decision is Contrary to Law)

71. Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint.

72. Under the APA, the reviewing court shall set aside the final agency decision if, inter alia, it is contrary to law, arbitrary and capricious, an abuse of discretion, or unsupported by substantial evidence in the record. 5 U.S.C. §706.

73. This Court must set aside the Secretary's refusal to issue capital DSH adjustments to the Hospital for FYs 2018–2020 as contrary to law because, *inter alia*, (a) there is no statutory authority that allows the Secretary to use a hospital's election of rural status under the operating prospective payment system to eliminate the hospital's capital DSH adjustment, (b) the denial is arbitrary, capricious, and otherwise unlawful under the APA, and (c) the 2006 version of 42 C.F.R. §412.320(a)(1)(iii) is void *ab initio* and cannot be applied to the Hospital for periods before October 1, 2023.

74. As relates to the capital DSH adjustments to the Hospital for FYs 2018 and 2019, this Court must set aside the Secretary's substantive claim requirement in 42 C.F.R. §413.24(j) and 42 C.F.R. §405.1873, and the portions of the PRRB's decisions based thereon, because they conflict with 42 U.S.C. §1395oo, the decision of the Supreme Court in *Bethesda Hospital Ass'n. v. Bowen*, 485 U.S. 399 (1988), and are otherwise substantively and procedurally unlawful.

**COUNT II**
**Judicial Review Under the APA**
**(Decision is Arbitrary and Capricious)**

75. Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint.

76. Under the APA, the reviewing court shall set aside the final agency decision if, inter alia, it is contrary to law, arbitrary and capricious, an abuse of discretion, or unsupported by substantial evidence in the record. 5 U.S.C. §706.

77. This Court must set aside the Secretary's refusal to issue capital DSH adjustments to the Hospital for FYs 2018–2020 as arbitrary and capricious because, *inter alia*, (a) of the reasons set forth in the *Toledo* decision, (b) there is no statutory authority that allows the Secretary to use a hospital's election of rural status under the operating prospective payment system to eliminate the hospital's capital DSH adjustment, (c) the denial is arbitrary, capricious, and otherwise unlawful under the APA, and (d) the 2006 version of 42 C.F.R. §412.320(a)(1)(iii) is void *ab initio* and cannot be applied to the Hospital for periods before October 1, 2023.

78. As relates to the capital DSH adjustments to the Hospital for FYs 2018 and 2019, this Court must set aside the Secretary's substantive claim requirement in 42 C.F.R. §413.24(j) and 42 C.F.R. §405.1873, and the portions of the PRRB's decisions based thereon, as arbitrary and capricious for numerous reasons, including that (a) each of CMS's asserted rationales for adopting the policy and its requirements has no applicability to regulatory challenges, such as the instant one, that the contractor is powerless to correct, (b) the PRRB's application of CMS's substantive claim requirement to bar payment of capital DSH adjustments to the Hospital for FYs 2018–2020 is arbitrary, capricious, and contrary to law because it deprives the Hospital of an appeal opportunity and reimbursement, for an alleged lack of specificity, for a payment matter that the contractor is powerless to change and apparently as to which it failed to seek clarification, thus imposing an unreasonable sanction in light of the alleged shortcoming (at most, an alleged lack of detail regarding the protest calculation that the contractor and CMS can directly discern from the Hospital's as-filed cost report protest items, the cost-report itself, and the well-established statutory and regulatory formula for calculating capital DSH adjustments).

**COUNT III**
**Judicial Review Under the APA and the Medicare Act**
**(Decision is Arbitrary and Capricious Because it is Unsupported by the Evidence in the Record)**

79. Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint.

80. The APA requires reviewing courts to reverse agency determinations that are "unsupported by substantial evidence." 5 U.S.C. §706(2)(E). Under the "substantial evidence" standard, an agency must consider the whole record upon which an agency's factual findings are based, including whatever in the record fairly detracts from the evidence supporting the agency's decision. *See, e.g.*, *Genuine Parts Co. v. EPA*, 890 F.3d 304, 346 (D.C. Cir. 2018).

81. This Court must set aside the Secretary's refusal to issue capital DSH adjustments to the Hospital for FYs 2018–2020 as contrary to law because the Secretary's 2006 version of 42 C.F.R. §412.320(a)(1)(iii) is unsupported by substantial evidence.

82. This Court must set aside the portions of the PRRB's decisions that the Hospital failed to comply with the requirements of 42 C.F.R. §413.24(j) with respect to the Hospital's FYs 2018 and 2019 as-filed Medicare cost reports concerning the capital DSH adjustment item as unsupported by substantial evidence because the Hospital effectively complied with the requirements of, and fully satisfied the purposes of, the self-disallowance regulation. *See also* 42 C.F.R. §405.1873.

**COUNT IV**
**Mandamus**

83. Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint.

84. Under the Mandamus Act (28 U.S.C. §1361), federal district courts have "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Jurisdiction under the Mandamus Act is available if the plaintiff has a clear right to relief, the defendant has a clear duty to act, and there is no other adequate remedy available to the plaintiff. *See In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005). A defendant has a clear duty to act where "the duty to be performed is ministerial and the obligation to act peremptory and clearly defined." *Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C. Cir. 1995) (quoting *13th Reg'l Corp. v. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980).

85. The Secretary has the non-discretionary duty under the Medicare Act and other authorities to issue to the Hospital capital DSH adjustments for FYs 2018–2020. Accordingly, the Hospital is entitled to issuance of a writ of mandamus requiring the Secretary to order the contractor to make a new Medicare payment determinations for FYs 2018–2020 based on what the Hospital would have been paid if it were issued capital DSH adjustments for FYs 2018–2020. 28 U.S.C. §1361; *see also id.* §1651(a) (All Writs Act).

**REQUESTS FOR RELIEF**

WHEREFORE, the Hospital requests that this Court enter an Order:

1. Declaring the 2006 version of 42 C.F.R. §412.320(a)(1)(iii) unlawful generally, and specifically as to discharges occurring the Hospital's FYs 2018–2020, and must be vacated or, in the alternative, set aside as it relates to the Hospital;

2. Declaring that 42 C.F.R. §413.24(j) and 42 C.F.R. §405.1873 are unlawful generally, and specifically as to the Hospital's claims for capital DSH adjustments for FYs 2018 and 2019, and both regulations and the PRRB's decisions based thereon must be vacated or, in

the alternative, set aside as related to the Hospital;

3. Declaring that the Hospital's election to acquire rural status for FYs 2018–2020 does not preclude the Hospital from qualifying for a capital DSH adjustment for FYs 2018–2020 (or otherwise);

4. Requiring the Secretary to pay to the Hospital, with interest, all sums associated with the capital DSH adjustments for FYs 2018–2020 that have been wrongfully withheld,

5. Remanding this matter to the Secretary with instructions to calculate the capital DSH adjustment payments due to the Hospital for FYs 2018–2020 and pay them to the Hospital, with interest calculated in accordance with 42 U.S.C. §1395oo(f)(2);

6. Requiring the Secretary to pay legal fees and costs of suit incurred by the Hospital; and

7. Providing for such other relief as the Court may consider appropriate.

Dated: August 31, 2026

Respectfully submitted,

By: /s/ Robert L. Roth

Robert L. Roth, Esq. (D.C. Bar No. 441803)
HOOPER, LUNDY & BOOKMAN, P.C.
401 9th Street, N.W., Suite 550
Washington, D.C. 20004
(202) 580-7701
rroth@hooperlundy.com

Sven C. Collins (Colo. Bar No. 30890)
HOOPER, LUNDY & BOOKMAN, P.C.
999 18th St., Suite 3000
Denver, CO 80202
(720) 687-2852
scollins@hooperlundy.com

*Attorneys for Plaintiff*